FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 JUL -6  PM 2:53

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

**STEFANIE S. WRIGHT**                                        **CIVIL ACTION**

**VERSUS**                                                              **NO: 04-3473-JCZ-SS**

**JO ANNE B. BARNHART, COMMISSIONER**
**OF SOCIAL SECURITY ADMINISTRATION**

## REPORT AND RECOMMENDATION

Plaintiff, Stefanie S. Wright ("Wright"), seeks judicial review, pursuant to Section 405(g) of

the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security

Administration (the "Commissioner") denying her claims for disability insurance benefits under Title

II of the Social Security Act ("Act"), 42 U.S.C. § 423.

## PROCEDURAL HISTORY

On March 19, 2003, Wright submitted her application for benefits. R. 81-83. She reported

that she suffered from chronic headaches and depression, she was unable to concentrate when she

talked to her customers on the phone and when she took her medication she had to lie down. R. 86.

On August 14, 2003, her application for benefits was denied. R. 65-68. On May 18, 2004, there was

a hearing before an ALJ, at which Wright, her husband and a vocational expert testified. R. 20-58.

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

On June 25, 2004, the administrative law judge ("ALJ") issued an unfavorable decision. R. 10-19.

On November 12, 2004, the Appeals Council denied her request for review. R. 5-8. On December

22, 2004, Wright filed a complaint for review of the Commissioner's decision. Rec. doc. 1. On June

13, 2005, the matter was submitted on cross-motions for summary judgment. Rec. docs. 8 and 9.

Wright is represented by counsel.

## STATEMENT OF ISSUES ON APPEAL

Plaintiff's request for judicial review raises the following issues:

Issue no. 1.     Did the ALJ err in ignoring the treating physician's medical opinion?

Issue no. 2.     Did the ALJ err in failing to find that Wright met the requirement for disability under Listing 12.04 for affective disorders?

Issue no. 3.     Did the ALJ err in failing to provide a complete hypothetical question to the vocational expert?

## THE ADMINISTRATIVE LAW JUDGE'S FINDINGS

The administrative law judge made the following findings relevant to the issues on appeal:

1.     Stefanie S. Wright meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2.     Ms. Wright has not engaged in substantial gainful activity since the alleged onset of disability.

3.     Ms. Wright has a combination of impairments that are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4.     These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.     The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

2

6.      Ms. Wright retains a residual functional capacity for the performance of a limited range of "light" work.

7.      Ms. Wright is unable to perform any of her past relevant work (20 CFR § 404.1565).

8.      Vocational expert testimony supports the finding that there are a significant number of jobs in the regional and national economies that Ms. Wright could perform.

9.      Stefanie S. Wright was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

R. 18.

## ANALYSIS

a.    <u>Standard of Review</u>.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. <u>Newton v. Apfel</u>, 209 F.3d 448, 452 (5th Cir. 2000); <u>Spellman v. Shalala</u>, 1 F.3d 357, 360 (5th Cir. 1993). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); <u>Newton</u>, 209 F.3d at 452. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's. <u>Id.</u>; <u>Selders v. Sullivan</u>, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial

evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Newton v. Apfel, 209 F.3d at 453; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step inquiry

---

[1]  The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

4

terminates if the Commissioner finds at any step that the claimant is or is not disabled. <u>Leggett v. Chater</u>, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry. <u>Id</u>. If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. <u>Greenspan</u>, 38 F.3d at 236; <u>Kraemer v. Sullivan</u>, 885 F.2d 206, 208 (5th Cir. 1989). When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant." <u>Id</u>.; accord <u>Selders</u>, 914 F.2d at 618.

The Court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history." <u>Martinez v. Chater</u>, 64 F.3d 172, 174 (5th Cir. 1995). "The Commissioner, rather than the courts, must resolve conflicts in the evidence." <u>Id</u>.

b.     <u>Testimony at the hearing before the Administrative Law Judge</u>.

At the time of the hearing Wright was 37 years old. R. 25. She was 5'5" and weighed 160

---

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. <u>Id</u>. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. <u>Id</u>. §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. <u>Id</u>. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

pounds.  R. 26.  She had completed one year of college.  R. 26.  All of her training was on the job.

R. 26.  She was married.  R. 25.  Her husband served in the Navy and was to retire in 2007.  R. 45-

46.  She had three children:  a son, who was 11; a daughter, who was 7; and a son, who was 5.  R.

25.  Since the onset of her problems, her children had not done as well in school.  R. 25-26.  Her

oldest son's school work dropped off.  R. 26.  Her daughter did not put as much effort into her

extracurricular activities.  R. 26.  Her youngest son was in speech therapy.  R. 26.  She was employed

by BellSouth Telecommunications as a telephone sales and service representative for three and a half

years when she began to experience problems.  R. 26 and 31.  Her last attempt at work was in

January and February of 2004, when she made a brief attempt to return to work.  R. 43-44.

Wright began experiencing problems at work in August, 2002.  R. 27.  She found that while

handling calls and attempting to make sales, she could not remember the job she was doing.  R. 27.

She had to get off the phone.  R. 27.  She went to the supervisor and found that she was not hearing

what the supervisor said.  R. 27.  She experienced memory loss problems.  R. 27-28.  She described

herself as unable to multi-task.  R. 28.  She was required to work with other persons performing the

same tasks in her immediate vicinity.  R. 29-30.  She found that she could not concentrate on her call

with the activity around her.  R. 29-30.  When she arrived at work in New Orleans, she found that

she could not remember the drive from her home in Slidell.  R. 32.

At first Wright believed she was dying.  R. 28.  She had thought of herself as a healthy

person.  R. 29.  If she had a headache, she took a Tylenol.  R. 29.  In August 2002, she spent nearly

a month in bed.  R. 29.  The only thing she did was get her children to and from school.  R. 29.  Her

husband was required to do housework and take care of the children.  R. 32.  There was a strain on

her marriage as she lost pay from BellSouth. R. 29. She and her husband received counseling and they participated in a marriage enrichment program at their church. R. 34. Their relationship improved with the counseling. R. 41.

Wright experienced a drastic change in her life. R. 35. She no longer wanted to do anything. R. 35. She experienced crying spells once or twice a week. R. 35. She took medication to help her sleep at night. R. 35. There were periods where she became feverish and abruptly had chills. R. 36. It was hard for her to sit still around people. R. 36-37. She experienced spells of dizziness or lightheadedness, nervousness and feelings of worthlessness. R. 37-39. She experienced headaches everyday and took medication for them. R. 39. She had some thoughts of suicide. R. 40. On some occasions she felt unable to drive home from a doctor's appointment and had to call her husband to bring her home. R. 42.

Wright saw internists, psychiatrists, a therapist, a rheumatologist, a neurologist and other specialists. R. 33. A cause for her headaches was not determined. R. 33-34.

Her daily activities included preparing her children for school and getting them to two different schools. R. 35 and 44. She went to the grocery store. R. 35. She spent time during the day in bed until it was time to pick up the children from school. R. 35.

Wright's husband reported that he had to assume many of the household duties, which created a lot of stress. R. 47 and 48. He was forced to resign from a position at work and assume other responsibilities. R. 47. He began working part-time to help with the loss of income. R. 49. He listed her as "an exceptional family member," so he could not be deployed overseas. R. 50.

Based on the hypothetical question posed by the ALJ which limited her to unskilled work,

the vocational expert testified that Wright could not perform her past relevant work. R. 52-53. The expert testified that there were jobs available that could be performed within the limitations. R. 54-55. If she was required to miss two unexpected days per month, her absences would be excessive. R. 56. If she could not concentrate on the job and had to take excessive breaks, she could not work. R. 57.

c.      Medical Evidence.

On August 22, 2002, Wright was seen by F. Martinez, M.D., at the Pelican Urgent Care facility for complaints of headaches, facial pressure, fatigue and malaise.[2] R. 136. A chest x-ray was negative. R. 137. She returned to Dr. Martinez on August 29, 2002 with complaints of depression. R. 135. On September 7, 2002, she was seen by him for complaints of constant headaches. R. 134. On September 7, 2002, blood work was done at NorthShore Regional Medical Center. R. 184-191. On September 13, 2002, she returned to Dr. Martinez for a follow-up visit. R. 133. An MRI of the head taken on September 18, 2002 did not reveal any abnormal enhancing lesions. It indicated the presence of a mucous retention cyst in her sinus. R. 132 and 150.

On September 21, 2002, Dr. Martinez diagnosed Wright with chronic headaches and an anxiety reaction. R. 131. He referred her to James M. Houser, M.D. ("Dr. J. Houser"), a neurologist, who saw her on October 7, 2002. R. 142. Because of a history of headaches, memory problems and transient ischemic attacks, an MR angiogram was taken on October 8, 2002. Results were normal. R. 141 and 149. On November 11, 2002, she returned to Dr. J. Houser. She reported

---

[2] Dr. Martinez' speciality is not identified.

8

that her headaches, anxiety and depression were becoming worse.  R. 144.  He recommended an ophthalmology evaluation for a pseudo tumor and prescribed additional medication.  R. 144.

On October 10, 2002, Wright was seen by Marielisa Sedrish, M.D., a rheumatologist, on a referral from Dr. Serrant.[3]  R. 205 and 209.  The diagnosis was undifferentiated connective tissue disease with no activity at that time.  Wright returned to Dr. Sedrish on October 18, 2002 and March 11 and 20, 2003.  R. 194, 199 and 204.  Dr. Sedrish ordered a number of laboratory tests.  R. 195-203 and 206-14.  On March 11, 2003, Wright complained of headaches and depression.  R. 199.  On March 20, 2003, she complained of headaches, pain on the left side of her neck and across her shoulders and numbness in her left arm.  R. 194.

On October 25, 2002, Rex Houser, M.D. ("R. Houser") of NorthShore Regional Medical Center performed a lumbar puncture because of Wright's complaints of intractable headaches.[4]  She was to follow-up on November 11, 2004.  R. 164-65.  No virus was isolated in the spinal fluid.  R. 177.  The other tests performed on the fluid were negative.  R. 167-179.  At the request of Dr. R. Houser, an MRI of the head was taken on January 27, 2003.  It was normal except for the sinus cyst.  R. 139.  On March 4, 2003, lab work was done for Dr. R. Houser.  The tests for encephalitis and West Nile virus were negative.  R. 163.

On November 15, 2002, Wright was seen by Aleta DeClouet, M.D., an internist with Primary Care Associates.  R. 217, 222 and 251.  She complained of persistent headaches since August 2002. After testing, she was diagnosed with sleep apnea.  R. 221-22.  She returned to Dr. DeClouet on

---

[3]  There are no other records referring to Dr. Serrant.

[4]  Dr. R. Houser's speciality is not identified.

9

January 6 and 27, 2003 and March 25, 2003. R. 218-20. On January 6, 2003, she complained of headaches. R. 220. On January 27, 2003, she reported vomiting and nausea. R. 219.

On December 6, 2002, Wright was seen by Dr. Terrell Hemelt, an ophthalmologist, on a referral from Dr. J. Houser, for complaints of pain in the left eye. R. 226 and 228. She returned to Dr. Hemelt on December 12 and 16, 2002 and March 27, 2003. R. 229-31. On April 15, 2003, Dr. Hemelt reported to the state consultant that she was seen by him on four occasions beginning in December 6, 2002. R. 226. Her visual acuity in both eyes was 20/20. He was unable to find any ocular reason for her headaches. He believed that she should have no difficulty sitting, standing, walking, lifting, carrying objects, hearing, speaking or traveling. He was not aware of any mental impairment, but had not examined her mental condition. R. 226.

On February 19, 2003, Wright was seen by Anthony Albright, M.D. at the NorthShore Regional Medical Center for complaints of headaches and depression. R. 153-161. Dr. DeClouet was shown as her primary doctor. R. 153. She reported episodes of nausea and vomiting. R. 154. An ultrasound of the abdomen was negative. R. 156. The results of an upper endoscopy were normal. Biopsies of the duodenum and stomach ruled out any inflammatory infections. Dr. Albright concluded that treatment for the migraines should lessen the episodes of nausea and vomiting and only supportive care was indicated. R. 154. The symptoms were related to migraine headaches. R. 160.

On June 9, 2003, Dennis Peyroux, D.C., a chiropractor, reported to Kemper National Services that Wright had bilateral defects on lateral flexion and rotation. He concluded that she needed continued treatment, including work hardening and exercise. He supported her request for

short-term disability but expected a full recovery.  R. 234-35.

Dr. DeClouet referred Wright to Barry Kusnick, M.D. of Cardiovascular Associates, who saw her on June 27, 2003.  R. 241-49.  Dr. Kusnick's history included a note that she exercised for stretching and abs and biked and walked three times a week.  R. 241.  The assessment was probable mitral valve prolapse, history of headaches, chest pain and palpitations.  R. 243.  He doubted that she suffered from vertebral basilar insufficiency.  R. 243.  He suggested medication for headache control.  R. 244.

Dr. DeClouet also referred Wright to Debra G. Elliot, M.D., for evaluation of her headaches, who saw her on July 9, 2003.  R. 251.  Dr. Elliot was associate clinical professor of neurology at Tulane University Hospital and Clinic and co-director of Tulane Headache Center.  R. 250.  Dr. Elliot's history indicated that the headaches began in August 2002 and continued to be severe as of her examination.  R. 236.  Blood work was positive for Epstein Barr virus infection in the past.  R. 236 and 250.  Dr. Elliot believed it was possible that this was the cause of her symptoms of fatigue, headache and depression.  R. 236.  Dr. Elliot indicated that it was not unusual for a patient to develop chronic headache syndrome after an Epstein-Barr infection.  R. 250.  Dr. Elliot reported that there was no treatment for the virus except for treatment of the symptoms, which was being done.  R. 236.  Wright's headaches limited her from any prolonged standing, walking, lifting, carrying or handling objects.  Concentration on detail tasks could increase her headaches.  She had a very mild difficulty with attention that Dr. Elliot linked to her memory problem.  Dr. Elliot found it difficult to say when Wright would be able to re-enter the work force.  Dr. Elliot hoped that she would be able to do so within a year.  R. 236.

On July 16, 2003, Wright was seen by David Ross, M.D., a neurologist, for nerve conduction studies on a referral from Suzanne Parke, D.O.[5] The studies were normal. A mild bilateral carpal tunnel syndrome was indicated. R. 265. A study indicated that C6, C7 and C8 were normal. R. 266. On July 30, 2003, Wright was seen by Roberta Rivera, M.D., a radiologist, for an ultra-sound examination on a referral from Suzanne Parke, D.O. There was mild to moderate inflammation in the cervical region, mild inflammation in the thoracic region, and moderate inflammation in the lumbar region. R. 260-62.

On January 28, 2003, Wright began seeing J. Robert Barnes, M.D., a psychiatrist, for depression. R. 192. She continued to receive treatment from Dr. Barnes through May 3, 2004. R. 313. He reported that her depression was brought on by severe recurrent headaches. She received antidepressants. On March 5, 2003, he described her as disabled by her headaches and accompanying depression. R. 192. On October 7, 2003, Dr. Barnes completed a medical assessment of her ability to do work-related activities. He placed all but one of her abilities in the poor to none category. R. 314-15. On November 9, 2003, Dr. Barnes recommended that she be permanently restricted from the service representative position with BellSouth or any position of similar stress. R. 312. He did permit her to return to work part-time beginning November 24, 2003. R. 312. On May 3, 2004, he reported that she was receiving treatment for major depression. She remained depressed despite aggressive treatment and in his opinion was disabled. R. 313.

On May 13, 2003, Beverly Stubblefield, a clinical psychologist, performed a psychological

---

[5] There are no records of any treatment by Suzanne Parke, D.O.

evaluation. R. 232-33. She reported that Wright wanted to find something mentally wrong with her, because nothing was found to be physically wrong. R. 232. The Minnesota Multiphase Personality test was administered. She was diagnosed with generalized anxiety disorder, histrionic personality disorder, encephalitis, occupational problems and problems with access to health care. Once her condition was stabilized, Dr. Stubblefield reported that she could consider returning to less stressful work. At the time of the evaluation, Dr. Stubblefield opined that Wright was unable to maintain gainful employment due to pain and anxiety. R. 233.

On July 16, 2003, Wright was seen by Jeffrey McGilbra, M.D., a psychiatrist, for a consultative examination. R. 237-40. She reported that she first sought psychiatric treatment in Guam in 1996, while her husband was stationed there. She was placed on trials of Pamelor, Prozac and Paxil. R. 238. After her husband was transferred to Jacksonville, Florida, she saw a psychiatrist there from 1999 to 2002. She was treated with Paxil and Ativan for anxiety and depression. R. 238. There was no history of inpatient hospitalizations. At the time of Dr. McGilbra's examination, she was taking Effexor, Klonopin, Neurontin, Ambien and Verapamil. She reported good results from the treatment. R. 238. She reported ongoing marital problems. R. 238. She denied suicidal and homicidal ideation. R. 239. Her concentration was good as tested with mental arithmetic. R. 239-40. The diagnosis was moderate major depressive disorder. Dr. McGilbra recommended that she continue to receive regular treatment with her private psychiatrist on an outpatient basis, including medications. She appeared to be stable on the medications. He recommended that she be followed by her neurologist for her recurrent headaches. R. 240.

On August 8, 2003, William Black, Ph.D., a professor of psychiatry and neurology at Tulane,

completed a neuropsychological report on a referral from Dr. Stubblefield. R. 267-81. The tests administered included: Wechsler Abbreviated Scale of Intelligence; Wechsler Test of Adult Reading; Boston Naming Test; Controlled Word Association Test; Wechsler Memory Scale; Booklet Category Test; Brief Test of Attention; Digit Vigilance Test; Bender Gestalt Test; Grooved Pegboard; Test of Memory Malingering; Beck Anxiety Inventory; Beck Depression Inventory; and Million Clinical Multiaxial Inventory. The results indicated that Wright was functioning in the normal range for most cognitive domains. Her attention and concentration were in normal limits, but there would be a decline with less than ideal conditions. When attention was required to be sustained over time, there would be a decline. A direct causal relationship between her reported headaches and her reported cognitive problems could not be established. A more likely explanation was her emotional problems. The data suggested that for an extended time she suffered from severe depression and moderate to severe anxiety. Other personality traits may exacerbate her psychological problems. R. 280. Dr. Black found that Wright should be considered disabled from a neuropsychological basis due to emotional problems. R. 281.

d.    Plaintiff's Appeal.

Issue no.1.    Did the ALJ err in ignoring the treating physician's medical opinion?

Wright contends that the ALJ improperly rejected the opinion of Dr. Barnes, Wright's treating psychiatrist. Dr. Barnes treated her from January 28, 2003 through at least May 3, 2004. R. 192 and 313. He reported that her depression was brought on by severe recurrent headaches. R. 192. On May 3, 2004, he reported that she was receiving treatment for major depression. She remained depressed in spite of aggressive treatment and, in his opinion, was disabled. R. 313.

14

Wright contends that the ALJ's failure to properly consider Dr. Barnes' opinion demonstrates that

he violated the requirement in Social Security Ruling (SSR) 85-15 that cases involving mental illness

be subject to thorough evaluation.  The Commissioner contends that the ALJ was free to reject the

opinion of any physician when the evidence supports a contrary conclusion.  The Commissioner

argues that the ALJ complied with SSR 85-15 by including a mild limitation in social interaction and

a moderate limitation in concentration, persistence and pace.

 The ALJ's review of the medical evidence refers to treatment by Dr. Barnes and his opinion

linking the depression to the headaches.  The ALJ noted Dr. Barnes' conclusion that her depression

interfered with all of her mental functioning and rendered her disabled.  R. 15.  The ALJ noted the

inconsistencies in the record concerning the nature of Wright's impairments, including whether the

headaches were related to physical or mental factors.  He commented that while Dr. Barnes

considered Wright's systems to affect all of her mental functioning, Dr. Black found that she

functioned in the normal range for most cognitive domains.  R. 16.

 In Newton v. Apfel, 209 F.3d 448 (5th Cir. 2000), the Fifth Circuit stated:

> Even though the opinion and diagnosis of a treating physician should be afforded
> considerable weight in determining disability, the ALJ has the sole responsibility for
> determining a claimant's disability status.  The ALJ is free to reject the opinion of
> any physician when the evidence supports a contrary conclusion.  The treating
> physician's opinions are not conclusive.  The opinions may be assigned little or no
> weight when good cause is shown.  Good cause may permit an ALJ to discount the
> weight of a treating physician relative to other experts where the treating physician's
> evidence is conclusory, is unsupported by medically acceptable clinical, laboratory,
> or diagnostic techniques, or is otherwise unsupported by the evidence.

Id. at 455 (citations, quotation marks and brackets omitted).  See also  Scott v. Heckler, 770 F.2d

482, 485 (5th Cir. 1985).

The issue is whether the evidence supported a conclusion that was contrary to Dr. Barnes' opinion. Wright's headaches began in August 2002. R. 136. She did not begin seeing Dr. Barnes until January 28, 2003. R. 192. During the intervening period she was seen by internists, a neurologist, a rheumatologist, an ophthalmologist and at least one other physician in an unsuccessful effort to find a physical cause for her headaches. The only one of these physicians to comment on her physical abilities was Dr. Hemelt, who believed that she should have no difficulty sitting, standing, walking, lifting, carrying objects, hearing, speaking or traveling. R. 226. After Wright sought treatment from Dr. Barnes in January, 2003, she continued to see other physicians. On June 27, 2003, she reported to Dr. Kusnick that she exercised for stretching and abs and biked and walked three times a week. R. 241. On July 9, 2003, Dr. Elliot reported that her headaches limited her from any prolonged standing, walking, lifting, carrying or handling objects. Dr. Elliot indicated that concentration on detail tasks could increase her headaches and that she had a very mild difficulty with attention linked to her memory problem. R. 236. The reports of these physicians provide evidence that is contrary to Dr. Barnes' opinion that she was disabled.

There is no evidence that Wright's depression was so severe that it required hospitalization. After she began seeing Dr. Barnes in January 2003, she was also seen by Dr. Stubblefield and Dr. Black, psychologists, and Dr. McGilbra, a psychiatrist. Dr. Stubblefield found that once her condition was stabilized she could consider returning to less stressful work. R. 233. Dr. Black, who performed extensive tests on a referral from Dr. Stubblefield, found that she functioned in the normal range for most cognitive domains. Although her attention and concentration functioned in the normal range, Dr. Black believed there would be a decline in less than ideal conditions. R. 280. Dr.

16

McGilbra noted that Wright reported good results from her drug treatment. R. 238. Her concentration was good. R. 239-40. He found that she appeared stable on medication and the prognosis was fair to good. R. 240. He diagnosed her with moderate major depressive order. R. 240. The medical evidence of her mental condition also supports a conclusion contrary to Dr. Barnes' opinion. There were inconsistencies in Dr. Barnes' opinions. In October 2003, he assessed poor to no ability to perform work-related functions, but the next month he released her for part-time work. R. 314-15 and 312.

Dr. Barnes' three letters merely describe the fact that Wright is under his care, that she is being treated with prescription drugs, that she suffers from major depression brought on by severe headaches, and that she is disabled or, in the case of the November 13, 2003, letter she may return to part-time work. R. 192 312 and 314. His opinion on her disability was conclusory. Dr. Barnes' explanation for his assessments of her ability to perform work-related activities only refers to her severe headaches, depression, anxiety and emotional instability. "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory. . . . ." Newton. at 455. In Frank v. Barnhart, 326 F.3d 618 (5th Cir. 2003), the Fifth Circuit stated that:

> Among the opinions by treating doctors that have no special significance are determinations that an applicant is "disabled" or "unable to work." 20 C.F.R. § 404.1527(e)(1). These determinations are legal conclusions that the regulation describes as "reserved to the Commissioner." The factors set out at subsection (d) apply only to medical opinions, not opinions "reserved to the Commissioner." Assuming arguendo that the ALJ did not consider the six factors in subsection (d), he was not required to do so with respect to Dr. Zeringue's opinion that Frank could not work. The doctor's opinion was not a medical opinion within the meaning of the regulation.

17

Id. at 620.

Wright contends that the ALJ did not properly consider her impairments at step two of the evaluation process. The ALJ found that her headaches and her depressive, anxiety and personality disorders were "severe." R. 14-15. Wright urges that the ALJ should have found that her neck and shoulder pain, weakness in her arm, sleep apnea and chest pains were "severe" impairments as well. Wright was diagnosed with sleep apnea by Dr. DeClouet in December 2002. The test indicated that her sleep efficiency was more than 86%. R. 221. She took medication to help her sleep at night. R. 35. There is substantial evidence that the sleep apnea and other physical conditions were not severe within the meaning of the regulations. 20 C.F.R. § 404.1521.

Wright contends that the ALJ's decision lacks the thoroughness in evaluation required by SSR 85-15. Her reliance on SSR 85-15 is misplaced. This ruling applies only to situations in which the claimant suffers an alleged mental impairment that causes a severe adverse reaction to even the mildest demands of work. Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995). The evidence does not establish that Wright's depression causes such reaction. Assuming that SSR 85-15 was applicable, the ALJ made the required thorough evaluation. After describing the medical evidence, the ALJ considered her description of her daily activities. R. 15-16. He noted the inconsistencies in the medical record concerning the cause of her headaches. After further comment on the evidence from the psychiatrists and psychologists, including Dr. Barnes, he stated:

> Although Ms. Wright testified to constant headaches and adverse medicinal side-effects, she cares for three young children and engages in a wide range of routine activities. Ms. Wright's residual capabilities outweigh her limitations. When her mental status is evaluated under . . . the regulations, I find no more than "mild" limitations in her activities in daily living and social functioning. . . . I . . . find

"moderate" limitations in concentration, persistence and pace, with a specific vocational restriction to routine work tasks which are no more than average pace.

R. 16. The ALJ's hypothetical question incorporated the restriction for "routine non-detailed or highly complex" tasks. R. 53-54. The ALJ's decision demonstrates the required evaluation under SSR 85-15.

Issue no.2.    Did the ALJ err in failing to find that Wright met the requirement for disability under Listing 12.04 for affective disorders?

Wright contends that she meets the "A" and "B" criteria for affective disorders. Where the diagnosis is depression, the "A" criteria require at least four of the following: (1) anhedonia or pervasive lost of interest in almost all activities; (2) appetite disturbance with change in weight; (3) sleep disturbance; (4) psychomotor agitation or retardation; (5) decreased energy; (6) feelings of guilt or worthlessness; (7) difficulty concentrating or thinking; (8) thoughts of suicide; or (9) hallucinations, delusions or paranoid thinking. 20 C.F.R. part 404, subpart P, app. 1. section 12.04. Wright contends that she satisfied the "A" criteria with anhedonia, sleep disturbance, decreased energy and difficulty in concentrating or thinking. The Commissioner concedes that the "A" criteria were satisfied and this is implicit in the ALJ's analysis at step three of the sequential analysis. Rec. doc. 9 at p. 11 and R. 15.

The "B" criteria require at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. part 404, subpart P, app. 1. section 12.04. Wright argues that Dr. Elliot's finding that interaction with other people and concentration on detailed tasks could

19

exacerbate her problems demonstrates that she satisfied the "B" criteria.  The ALJ, however, found

that there were no marked or extreme limitations for the "B" criteria.  R. 15.  Dr. Elliot's report of

August 1, 2003 does not support the finding urged by Wright.  Dr. Elliot described her limitations

as including a "very mild difficulty with attention. . . ."  R. 236.  She reported that Wright's

"interaction with other people and concentrating on detail task can also increase her headache."  Id.

This does not support a finding that Wright suffered from marked limitations.  There is no contention

that Wright met the "C" criteria for affective disorders.  The ALJ did not err in failing to find that

Wright met the requirement for disability under Listing 12.04 for affective disorders.

Issue no.3.     Did the ALJ err in failing to provide a complete hypothetical question to the
                vocational expert?

Wright contends that the ALJ's hypothetical question to the vocational expert was flawed

because it failed to identify all of her limitations.  She argues that she suffered from chronic and

severe headaches, major depression, anxiety, fatigue, weakness in both arms and pain in her neck

and shoulder.  She contends that these significantly impacted her ability to maintain social

interaction and sustain concentration and persistence.  In the absence of all exertional and non-

exertional limitations, she urges that the vocational expert was unable to accurately assess her

vocational abilities.  The Commissioner disagrees.

"When framing hypothetical questions to a vocational expert, the ALJ must comprehensively

describe the mental and physical limitations on the claimant's ability to function, in order that the

vocational expert be able to assess whether employment exists for a person with such disabilities."

Wroblewski v. Califano, 609 F.2d 908, 914 (5th Cir. 1979).  When allegations of limitations are

found not to be credible by the ALJ, they may be properly excluded from the hypothetical posed to the vocational expert. Owens v. Heckler, 770 F.2d 1276, 1282 (1985).

In his decision the ALJ found Wright possessed no more than mild limitations of her activities of daily living and social functioning and moderate limitations in concentration, persistence and pace and that these limitations restricted her to routine work tasks with no more than average pace. R. 16. He incorporated these limitations into the hypothetical question when he limited it to routine repetitive activities that were not detailed or highly complex. R. 54. The ALJ partially credited Wright's complaints of headaches but found that they did not seriously limit her activities. R. 17. Based on these findings he found that she retained a residual functional capacity to perform a limited range of light work. R. 17. The ALJ acknowledged that Wright's ability to perform a <u>full</u> range of light work was subject to additional limitations. R. 17. This is a reference to the mild and moderate limitations described above and the limitations on her physical activity. R. 16-17. With these limitations, there was work that could be performed. R. 17-18.

The ALJ's decision and the hypothetical question posed to the vocational expert demonstrate that he included the limitations that he credited from the medical evidence. The ALJ found that her allegations regarding her limitations were not totally credible. R. 18. This finding was based on: (1) her description of her daily activities which included readying and taking her children to school, preparation of meals, doing house and yard work, shopping, visiting neighbors, attending church and driving places; and (2) Dr. Stubblefield's report that she was prone to exaggeration and over dramatization. R. 16. In addition, Dr. Kusnick noted that she maintained an exercise routine that included biking and walking three times a weeks. R. 241. There is substantial evidence to support

the finding that Wright's her allegations were not totally credible.  The ALJ properly framed the hypothetical question.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that defendant's motion for summary judgment (Rec. doc. 9) be GRANTED and plaintiff's motion for summary judgment (Rec. doc. 8) be DENIED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within ten (10) working days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this 5th day of July, 2005.

**SALLY SHUSHAN**
**United States Magistrate Judge**

22